**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BRUCE EUGENE FLETCHER JR., | ) | CASE NO. 5:21-CV-02217-CEH |
| | ) | |
| Plaintiff, | ) | |
| | ) | CARMEN E. HENDERSON |
| v. | ) | UNITED STATES MAGISTRATE JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | **MEMORANDUM OPINION  & ORDER** |
| | ) | |
| Defendant, | ) | |

## I. Introduction

Plaintiff, Bruce Eugene Fletcher ("Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 9). For the reasons set forth below, the Court OVERRULES Claimant's Statement of Errors and AFFIRMS the Commissioner of Social Security's decision denying Claimant DIB.

## II. Procedural History

Claimant filed his first application for DIB on July 17, 2011, alleging a disability onset date of February 1, 2011. (ECF No. 7, PageID #: 119). His claim was denied initially and upon reconsideration, and Claimant filed a request for a hearing before an Administrative Law Judge ("ALJ"). (ECF No. 7, PageID #: 119). On September 2, 2013, Claimant, who was represented by counsel, testified before the ALJ along with a vocational expert. (ECF No. 7, PageID #: 119). On September 27, 2013, the ALJ issued an unfavorable decision. (ECF No. 7, PageID #: 116).

On March 6, 2015, Claimant filed a second application for DIB, alleging a disability onset date of October 1, 2013. (ECF No. 7, PageID #: 45). The application was denied initially and upon reconsideration, and Claimant requested a hearing before an ALJ. (ECF No. 7, PageID #: 190). On January 17, 2017, a new ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (ECF No. 7, PageID #: 71–72). On May 11, 2017, the ALJ issued a written decision finding Claimant was not disabled. (ECF No. 7, PageID #: 42–59). The ALJ's decision became final on January 24, 2018, when the Appeals Council declined further review. (ECF No. 7, PageID #: 31).

Claimant then filed a complaint in the United States District Court for the Northern District of Ohio and obtained a remand from Magistrate Judge George J. Limbert, upon the parties' joint motion for remand. (ECF No. 10 at 2); Joint Motion for Remand at 1, *Fletcher v. Comm'r of Soc. Sec.*, No. 5:18-cv-00654-GJL (N.D. Ohio Sept. 26, 2018). The Appeals Council issued an Order of Remand on March 29, 2019, and a new hearing took place on September 24, 2019, before the same ALJ. (ECF No. 10 at 2). The Claimant and a vocational expert testified at the second hearing. (ECF No. 7, PageID #: 2204). The ALJ again issued an unfavorable decision on November 15, 2019, and the Appeals Council again denied review. (ECF No. 10 at 2).

On November 22, 2021, Claimant filed the instant Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 10, 13-1, 14). Claimant asserts the following assignments of error:

> (1) The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived her authority from Commissioner Saul was constitutionally defective.

> (2) The ALJ erroneously failed to follow the remand order of this Court when she failed to find that there was new and material

> evidence precluding the application of Acquiescence Ruling
> 98-4(6).
>
> (3) The ALJ committed harmful error as her RFC was not
> supported by substantial evidence when she found that
> Claimant could perform work at the light level of exertion.

(ECF No. 10 at 1).

## III. Background

### A. Relevant Hearing Testimony

At the hearing, Claimant testified to a number of conditions he experienced between October 2013 and June 2014. Claimant testified that he met with a heart doctor and an endocrinologist for his diabetes during the period. (ECF No. 7, PageID #: 2244–45). He also attended counseling sessions to treat his concentration problems and depression. (ECF No. 7, PageID #: 2245). Claimant testified that his overall health conditions from October 2013 to June 2014 were worse compared with previous periods and that he struggled with shoulder problems, back pain, and headaches and lightheadedness from his medications. (ECF No. 7, PageID #: 2246–48). Clamant also testified that he began using a cane in the spring of 2014 to combat balance and coordination issues from neuropathy in his feet. (ECF No. 7, PageID #: 2241).

Throughout the hearing, Claimant struggled to remember many of his symptoms during the time in question. Because of this, the ALJ questioned him about his current health conditions. Claimant testified that he currently is mostly sedentary and largely remains at home. (ECF No. 7, PageID #: 2243). His wife assists him with bathing, dressing, and transportation to appointments. (ECF No. 7, PageID #: 2243–44). He has difficulties focusing on television shows or reading. (ECF No. 7, PageID #: 2243).

### B. Relevant Medical Evidence

The ALJ summarized Claimant's health records and symptoms:

3

Diligent search indicates that the earliest [podiatrist] treatment records date to July 2, 2014. On this date, there is no gait examination, and the plan of treatment is restricted to diabetic shoes, custom and "over-the-counter" orthotics, and a Transcutaneous Electrical Nerve Stimulator (B6F). On July 21, 2015, the claimant indicates that the only impediment to ambulation are his long toenails (B33F/4). The only plan of treatment on this date was for the continued use of supportive shoes (B33F/5). Treatment notes dated July 23, 2015 (B33F/2) and January 15, 2016 (B40F/1), both indicate that the claimant is walking for exercise. Neither visit contains a gait examination, neither contains a gait-related diagnosis, and neither visit includes a cane in the ongoing plan of treatment (B33F/2), (B40F/2). In a treating source statement, dated August 19, 2015, Dr. Buccilli offered the opinion that the claimant had no limitations standing and/or walking (B26F/1), and that a cane was not necessary (B26F/2). The first identifiable reference to an unsteadiness of gait does not appear in his notes until November 2, 2016 (B59F/8), more than two years after the date last insured in this claim. Meanwhile, other providers had been reporting no discernible difficulties of gait, both during the period strictly relevant to this claim (B16F/25, 21), and through the end of 2014 (B16F/18, 15, 10, 7).

[. . .]

In terms of the claimant's alleged obesity, the claimant recorded a body weight of 220 pounds on November 25, 2013 (B1F/12), which corresponds to a body mass index in excess of thirty-four. In turn, this is consistent with a body weight of 226 pounds, recorded on February 3, 2014 (B10F/9) and May 7, 2014 (B9F/3). Several of the claimant's treating sources have indicated increasing his physical activity (B13F/4); however, no direct medical evidence indicates that the existence of this impairment causes the claimant excess fatigue, or otherwise unduly restricts his ability to move about freely within the workplace. Rather, this impairment is identified as severe for its contributory effects, potentially marked, on the claimant's other severe impairments, particularly those affecting his weight bearing, musculoskeletal system.

In terms of the claimant's alleged diabetes mellitus, this impairment was identified during the previous decision. Within the present record, there is a single visit to an endocrinologist. The impairment was uncontrolled through the date last insured, judging from the hemoglobin A1C level of 9.5%, recorded on March 13, 2014 (B12F/4).

4

However, and despite his non-compliance with follow-up, treatment recommendations and diet (B12F/12), the monofilament examination of March 13, 2014 reported normal findings (B12F/14).

The claimant is prescribed a regimen of prescription medications intended to address this impairment (B1E/5), but, as noted, his compliance has been only fair.

In terms of the claimant's alleged coronary artery disease, status-post stenting, this impairment was identified in the previous decision. However, a review of the relevant records confirms the impression that the existence of this impairment would not have been preclusive of all types of work.

The claimant had a single visit to his cardiologist during the period relevant to this claim. On March 13, 2014, the cardiologist noted simply that the claimant had known coronary artery disease, but with a low-normal left ventricular ejection fraction on his last assessment (B18F/11).

Clinical examinations included in the record for the period relevant to this claim were entirely normal, including one dated October 29, 2013, which indicated a regular rate and rhythm, with no murmurs, rubs or gallops (B19F/21), one dated March 13, 2014, which indicated a regular rhythm, with no ectopy (B12F/13), or one dated June 6, 2014, which reported a regular rate and rhythm, with no murmurs, rubs or gallops (B19F/14).

The claimant was prescribed a regimen of supportive medications discernibly intended to address this impairment (B1E/5).

In terms of the claimant's alleged osteoarthritis of the left hip, this impairment was identified in the previous decision. However, consideration of the relevant records confirm the impression that the existence of this impairment would not be preclusive of all types of work.

There are no objective diagnostic imaging studies presented within the period relevant to this claim.

There are no discrete episodes of treatment for this impairment within the period relevant to this claim.

The claimant did make use of pain medications, prescribed for his

shoulder, but which he indicated were effective in managing his pain generally (B16F/21, 25, 26, 32).

He had followed no other discernible course of treatment during the period relevant to this claim.

General clinical examinations included in the record consistently reported either minimal, or wholly benign findings, including one dated October 29, 2013, which indicated full range of motion of all extremities, with normal strength and reflexes, and no neurological deficits (B19F/21), or one dated February 21, 2014, which reported full range of motion of all extremities, with normal strength and reflexes, and no neurological deficits (B19F/18).

In terms of the claimant's alleged degenerative disc disease of the lumbar spine, this impairment was identified in the previous decision. However, examination of the record for the period relevant to this claim confirms the impression that the existence of this impairment would not be preclusive of all types of work.

X-ray examination of the lumbar spine, dated October 16, 2013, was entirely unremarkable, including throughout flexion and extension views (B17F/105).

Diagnostic imaging of the lumbar spine, dated August 27, 2013, indicated mild facet arthrosis at the L5/S1 vertebral joint, with a bulge and annular tear at the L1-L2 vertebral joint, causing mild canal stenosis, but no compressive pathology at any lumbar level (B62F).

Diagnostic scanning of the lumbar spine, dated October 16, 2013, indicated mild degenerative disc disease, but no frank herniation or compressive pathology at any level (B17F/106).

The claimant did consult on two occasions with an orthopedic surgeon (B19F/127, 119); however, he was released to return "as needed" with a referral to physical therapy after the second visit (B19F/122).

The claimant never discernibly attended physical therapy during the period relevant to this claim.

General clinical examinations included in the record consistently reported either minimal, or wholly benign findings, including one dated October 29, 2013, which indicated full range of motion of all extremities, with normal strength and reflexes, and no neurological

deficits (B19F/21), or one dated February 21, 2014, which reported full range of motion of all extremities, with normal strength and reflexes, and no neurological deficits (B19F/18).

The claimant did make use of pain medications, prescribed for his shoulder, but which he indicated were effective in managing his pain generally (B16F/21, 25, 26, 32).

In terms of the claimant's alleged tendonitis of the right shoulder, this impairment was identified in the previous decision. However, examination of the records relevant to the period for this claim, confirms the impression that the existence of this impairment would not be preclusive of all types of work.

The record for the period relevant to this claim contained no radiographic or imaging studies of the claimant's shoulder.

He had attended pain management for this impairment, and followed a regimen of pain medications, repeatedly assessed as effective in ameliorating his symptoms (B16F/21, 25, 26, 32).

However, he had declined physical therapy, or a course of injection therapies (B16F/21).

Clinical examinations included in the record have consistently reported either mildly adverse, or benign findings, including one dated November 19, 2013, which indicated 100 degrees of abduction, and with tenderness to palpation, but with no swelling or atrophy, and normal strength (B16F/33), one dated January 14, 2014, which reported 160 degrees of abduction, and tenderness, but no swelling or atrophy, and normal strength (B16F/29), or one dated May 16, 2014, which reported tenderness and reduced range of motion, but normal strength and no atrophy (B16F/21).

The claimant was known not to be a surgical candidate for this period (B16F/25).

In terms of the claimant's alleged right finger injury, this impairment was identified in the previous decision. However, for the period relevant to this claimant, this impairment is mentioned only in historical context, with no focused treatment or complaint during the period relevant to this claim. It appears that the impairment had neither improved nor deteriorated during this period, but rather remained in stasis during the nine months relevant to this claim.

In terms of the claimant's alleged asthma, this impairment was identified in the previous decision. However, an examination of the records for the period relevant to this claim, confirm the impression that the existence of this impairment would not be preclusive of all types of work.

There had been no discrete episodes of treatment for this impairment during the period relevant to this claim. The claimant had not required emergent treatment, been hospitalized or mechanically intubated for this impairment.

Through June 6, 2014 (B19F/14), the claimant had followed no regimen of prescription medications intended to address this impairment.

General clinical examinations had consistently reported either minimal, or wholly benign findings, including one dated October 29, 2013, which indicated that the claimant's lungs were clear to auscultation bilaterally (B19F/21), one dated March 13, 2014, which indicated normal breath sounds and no adventitious sounds (B12F/13), or one dated June 6, 2014, which indicated that the claimant's lungs were clear to auscultation bilaterally (B19F/14).

In sum, the evidence would indicate that the symptom limitations relevant to these impairments are not as severe as alleged. In a setting where the claimant would be restricted to the performance of work at the light exertional level, would be afforded the opportunity to alternate positions once each thirty-to-sixty minutes, with the proviso that he remain "on task" while doing so; where the claimant would occasionally push and/or pull, including the operation of foot controls, with the lower left extremity, and occasionally push and/or pull, including the operation of hand controls, with the right upper extremity; where the claimant would frequently reach overhead, handle and finger with the right upper extremity; where the claimant would occasionally balance, stoop, kneel, crouch, climb ramps and stairs, but never crawl, climb ladders, ropes or scaffolds; where the claimant would avoid concentrated exposure to humidity, wetness, extremes of heat and cold, and pulmonary irritants, including dust, gases, odors, fumes and poor ventilation; and, where the claimant would occasionally operate a motor vehicle, but would avoid all exposure to other workplace hazards, including unprotected heights and moving mechanical parts, adequate allowance will have been made for these impairments.

In terms of the claimant's alleged psychological disorders, the

claimant's impairment of depression was identified in the previous decision. While this finding would be consistent with the claimant's allegations of chronic depression, the record, when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work.

The claimant followed a regimen of psychotropic medications, but without discernible effect (B13F).

The claimant attempted cognitive behavioral therapy (B14F), but was regularly reported as noncompliant with treatment (B14F/18, 20, 22, 24), and said to offer questionable effort (B14F/23).

Notwithstanding these deficiencies, those mental status examinations included in the record consistently described either mildly adverse, or wholly benign findings, including one dated March 24, 2014, which indicated that the claimant presented with a depressed and anxious mood and restricted affect, but also as cooperative, with good eye contact, normal speech, a logical thought process, no delusions or hallucinations, no suicidal or homicidal ideation, unimpaired insight and judgment (B13F/7), or one dated June 16, 2014, which reported that the claimant presented with a depressed and anxious mood and restricted affect, but also as cooperative, with good eye contact, normal speech, a logical thought process, no delusions or hallucinations, no suicidal or homicidal ideation, unimpaired insight and judgment (B13F/7).

In sum, the evidence would indicate that the symptom limitations relevant to these impairments are not as severe as alleged. In a setting where the claimant would be restricted to the performance of simple, routine, repetitive tasks, involving the making of no more than simple work-related decisions, undertaken in a setting free of more than low production rate pace or quotas, which setting is low stress, adequate allowance will have been made for these impairments.

(ECF No. 7, PageID #: 2204–05, 2211–15).

## C. Opinion Evidence at Issue

The ALJ summarized the expert opinions in this case:

As for the opinion evidence, and as a prefatory matter, the treating source statements prepared by Loretta Isada, M.D., the claimant's cardiologist, under date of August 18, 2015 and November 8,

2016, Theodore Buccelli, DPM, the claimant's podiatrist, under date of August 19, 2015 and November 2, 2016, and Terry Wagner, D.O., the claimant's primary care physician, under date of September 23, 2015, November 15, 2016, and May 30, 2019, were carefully examined, but will not be analyzed. Each was dated more than one year after the claimant's date last insured, and none gave any indication, whether express or implied, that the limitations suggested were intended to apply retrospectively.

The state agency medical consultants, Dmitri Teague, M.D., and Steve McKee, M.D., each indicated that the residual functional capacity set out in the prior decision remained applicable on the current record. Specifically, they indicated that the claimant would be capable of work at the light exertional level, should be afforded the opportunity to alternate positions once each thirty-to-sixty minutes, with the proviso that he remain "on task" while doing so, that he could occasionally push and/or pull, including the operation of foot controls, with the lower left extremity, and could occasionally push and/or pull, including the operation of hand controls, with the right upper extremity; that he could frequently reach overhead, handle and finger with the right upper extremity, could occasionally balance, stoop, kneel, crouch, climb ramps and stairs, but never crawl, climb ladders, ropes or scaffolds; that he should avoid concentrated exposure to humidity, wetness, extremes of heat and cold, and pulmonary irritants, including dust, gases, odors, fumes and poor ventilation; that he could occasionally operate a motor vehicle, but should avoid all exposure to other workplace hazards, including unprotected heights and moving mechanical parts. Drs. Teague and McKee each had the opportunity to review the claimant's records, to which each cited liberally in support of their conclusions and each is well versed in the terminology and analytical framework employed in the disposition of these claims. The record shows a claimant with a spinal disorder, but no compressive pathology (B17F/105-106), (B62F), an untreated respiratory disorder (B19F/14), an untreated hip disorder, an untreated finger disorder, a soft tissue disorder of the right shoulder, a well-compensated cardiac disorder (B18F/11) and poorly controlled diabetes (B12F/14), but without a co-morbid condition causing end-organ damage (B12F/14), whose clinical examinations generally indicated preserved strength, reflexes and neurological function (B19F/21, 18), whose treatment has remained conservative and restricted to medications only (B16F/21), and who retains an array of activities of daily living of sufficient breadth to encompass putting on storm windows (B16F/29), helping a neighbor clean up after a flood (B14F/13), and caring for his lawn (B13F/4). Moreover, and as noted

10

previously, he concedes that his conditions have remained essentially stable (B2F/7, 12, 17), (B13F/4), see also (B13F/5, 6, 8), (B16F/21, 25). These opinions are consistent with, and supported by, the evidence of record and in consequence are afforded significant weight.

The claimant's podiatrist, Theodore Buccilli, DPM, indicated in a letter dated December 21, 2016, that on April 4, 2014, he had recommended a cane for the claimant, due to an unsteady gait pattern. Dr. Buccilli has treated the claimant over a lengthy period, but not discernibly prior to his date last insured, as the first office visit appears to have occurred on July 2, 2014 (B6F). He is reporting within the bounds of his professional certifications and specialty. However, treatment notes after the date last insured, and into late 2016 (B59F/8) offer no gait examinations, no diagnoses related to gait, and no plan of treatment including the use of a cane (B6F), (B33F), (B40F). In July 2015 (B33F/2) and January 2016 (B40F/1), the treatment notes report that the claimant is walking for exercise. In August 2015, Dr. Buccilli offered a treating source statement indicating that the claimant would have no limitations standing or walking (B26F/1) and would have no need of a cane (B26F/2). Meanwhile, during the period when the claimant still had insured status (B16F/25, 21), and into December 2014 (B16F/18, 15, 10, 7), other treatment providers were reporting ambulation without difficulty. This opinion is not supported by treatment notes from the relevant period. It is not consistent with, or supported by, treatment notes following the relevant period. It is directly contradicted by an opinion rendered closer, in time, to the relevant period and it is directly contradicted by other substantial evidence. This opinion is not eligible to be considered for assignment of controlling weight. Otherwise, the opinion is not consistent with, or supported by, the overall evidence of record, described in digest form in the preceding paragraph. It is afforded no weight.

The state agency psychological consultants, Janet Souder, Psy.D., and Paul Tangeman, Ph.D., each indicated that the residual functional capacity set out in the prior decision remained applicable on the current record. Specifically, they indicated that the claimant could perform simple, routine, repetitive tasks, involving the making of no more than simple work-related decisions, undertaken in a setting free of more than low production rate pace or quotas, which setting is low stress. The record shows a claimant with a high school level education (B1E/3), and no indication of deficits of memory, attention or concentration (B3F/7), (B13F/4, 8), who is consistently cooperative on

examination, making normal eye contact (B12F/13), (B13F/4), but who consistently presents with depression and anxiety (B13F/4, 7), which would be expected to periodically disrupt his attention and concentration. Restriction to simple and routine work, without stress, and without high production pressures would allow for these periodic disruptions, without becoming fatal to competitive work, particularly as the record shows overall stability of his depression and anxiety (B13F/4, 5, 6, 8). These opinions are consistent with, and supported by, the overall evidence of record and are accorded significant weight.

(ECF No. 7, PageID #: 2215–17). The ALJ also made the following findings about Dr. Buccilli's

letter where he alleged he recommended Claimant use a cane in April 2014:

At the previous hearing in this matter, the claimant's representative had conceded that no office visit from April of 2014 was in the evidence, or otherwise retrievable [hearing 1 testimony]. Dr. Buccilli does have treatment notes in the evidence, under his own name (B6F), as well as under the names of two corporate alter egos: "Podiatry, Inc.-Tallmadge" (B33F) and "NEO Foot Ankle Surgical Associates" (B59F/3). Diligent search indicates that the earliest treatment records date to July 2, 2014. On this date, there is no gait examination, and the plan of treatment is restricted to diabetic shoes, custom and "over-the-counter" orthotics, and a Transcutaneous Electrical Nerve Stimulator (B6F). On July 21, 2015, the claimant indicates that the only impediment to ambulation are his long toenails (B33F/4). The only plan of treatment on this date was for the continued use of supportive shoes (B33F/5). Treatment notes dated July 23, 2015 (B33F/2) and January 15, 2016 (B40F/1), both indicate that the claimant is walking for exercise. Neither visit contains a gait examination, neither contains a gait-related diagnosis, and neither visit includes a cane in the ongoing plan of treatment (B33F/2), (B40F/2). In a treating source statement, dated August 19, 2015, Dr. Buccilli offered the opinion that the claimant had no limitations standing and/or walking (B26F/1), and that a cane was not necessary (B26F/2). The first identifiable reference to an unsteadiness of gait does not appear in his notes until November 2, more than two years after the date last insured in this claim. Meanwhile, other providers had been reporting no discernible difficulties of gait, both during the period strictly relevant to this claim (B16F/25, 21), and through the end of 2014 (B16F/18, 15, 10, 7). The contention that a cane was medically necessary prior to the claimant's date last insured is not consistent with, or supported by, Dr. Buccilli's office notes from after the date last insured. There are no records

12

dating to the period when the claimant was still insured. This contention is contradicted by evidence from other providers, and is directly contradicted by Dr. Buccilli's own opinion, dated August 19, 2015.

(ECF No. 7, PageID #: 2204–05).

## IV.   The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

This claim was decided under the auspices of Acquiescence Ruling 98-4 (6) [colloquially, the *Drummond* Ruling]. Because there has been no evidence, new and material to the determination of disability, submitted with this claim, it is found that it would be appropriate, to be bound, in their entirety, by the findings of ALJ Collins [B1A].

This claim was decided under the auspices of Acquiescence Ruling 98-3 (6) [colloquially, the *Dennard* Ruling]. Because there have been no changes in the law or regulations since the previous decision, it is found that it would be appropriate to be bound, in their entirety, by the findings of ALJ Collins (B1A).

[. . .]

3. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). This finding adheres to that of the previous decision.

4. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant must be afforded the opportunity to alternate positions once each thirty-to-sixty minutes, with the proviso that he remain "on task" while doing so; the claimant may occasionally push and/or pull, including the operation of foot controls, with the lower left extremity, and may occasionally push and/or pull, including the operation of hand controls, with the right upper extremity; the claimant may frequently reach overhead, handle and finger with the right upper extremity; the claimant may occasionally balance, stoop, kneel, crouch, climb ramps and stairs, but may never crawl, climb

ladders, ropes or scaffolds; the claimant must avoid concentrated exposure to humidity, wetness, extremes of heat and cold, and pulmonary irritants, including dust, gases, odors, fumes and poor ventilation; the claimant may occasionally operate a motor vehicle, but must avoid all exposure to other workplace hazards, including unprotected heights and moving mechanical parts; the claimant is limited to the performance of simple, routine, repetitive tasks, involving the making of no more than simple work-related decisions, undertaken in a low stress setting [defined as a setting free of free of fast-paced production requirements or strict production quotas]. This finding adheres to that of the previous decision.

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2). This finding adheres to that of the previous decision.

9. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)). This finding adheres to that of the previous decision.

10. The claimant was not under a disability, as defined in the Social Security Act, at any time from October 1, 2013, the alleged onset date, through June 30, 2014, the date last insured (20 CFR 404.1520(g)). Except that this finding reflects the period relevant to the present claim, it adheres to that of the previous decision.

(ECF No. 7, PageID #: 2205, 2208, 2210, 2218, 2219).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## B.  Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r*

15

*of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

## C. Discussion

Claimant raises three issues on appeal. First, he argues that the appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. Next, Claimant claims the ALJ erroneously failed to follow the remand order of the District Court when she failed to find that there was no material new evidence precluding the application of Acquiescence Ruling 98-4(6). Claimant finally contends that the ALJ committed harmful error because substantial evidence did not support her RFC determination.

### 1. Claimant's constitutional challenge fails because he has not demonstrated a compensable harm

Claimant asserts that "[b]ased on the fact that Andrew Saul's tenure as Commissioner of SSA was unconstitutional, and he was Commissioner at the time of the ALJ and Appeals Council decisions, this matter should be remanded for a *de novo* hearing." (ECF No. 10 at 14). Claimant argues that because Acting Commissioner Saul was unconstitutionally appointed, the authority he delegated to the ALJ to hear and ultimately determine Claimant's application for disability benefits was also unconstitutional. (ECF No. 10 at 11). In support of this argument, Claimant cites to *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), for the proposition that Saul's appointment under 42 U.S.C. § 902(a) violates the separation of powers because it limits the President's authority to remove the Commissioner without cause. The Commissioner does not dispute that the relevant removal provision "violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause." (ECF No. 13-1 at 8 (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of

the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021) ("OLC Op."))). Citing *Collins v. Yellen*, 141 S. Ct. 1761, 1787–89 (2021), the Commissioner argues that Claimant is not entitled to relief because "even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually caused him harm." (ECF No. 13-1 at 8). Specifically, the Commissioner argues that Claimant cannot show harm to support his claim for relief because the ALJ's appointment was ratified by an Acting Commissioner who was not subject to the challenged removal restriction, and because Claimant cannot show that the removal restriction caused the denial of his benefits. (ECF No. 13-1 at 9 n.2).

As a threshold matter, the Court must first determine whether Claimant has standing to challenge the alleged unlawful removal provision. The Commissioner does not specifically contest Claimant's standing. (ECF No. 13-1). However, even if the parties do not challenge standing, "federal courts have a duty to consider their subject matter jurisdiction in regard to every case and may raise the issue *sua sponte*." *Answers in Genesis of Kentucky, Inc. v. Creation Ministries Int'l, Ltd.*, 556 F.3d 459, 465 (6th Cir. 2009).

To establish Article III standing, a plaintiff must show that he has suffered an "injury in fact" that is "fairly traceable" to the defendant's conduct and would likely be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (alterations and internal quotation marks omitted). "[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to allegedly unlawful conduct of the defendant, not to the provision of law that is challenged." *Collins*, 141 S. Ct. at 1779 (internal quotation marks and citation omitted).

Claimant first argues that he has standing because the commissioner "failed to proffer

any argument" that he lacked standing. (ECF No. 14 at 3). However, "[a]s a jurisdictional requirement, standing . . . cannot be waived or forfeited." *Virginia House of Delegates v. Bethune-Hill*, ⎯⎯ U.S. ⎯⎯, 139 S. Ct. 1945, 1951, 204 L.Ed.2d 305 (2019) (emphasis added).

Next, Claimant argues that he has standing as a "disability claimant who [] received an unfavorable decision during the administrative process[.]" (ECF No. 14 at 3 (citing *Brinkman v. Kijakazi*, 2021 WL 4462897, at *2 (D. Nev. Sept. 9, 2021) and *Sylvia v. Kijakazi*, No. 5:21-CV-076-M-BQ, 2021 WL 4692293, at *3 (N.D. Tex. Sept. 13, 2021), report and recommendation adopted, No. 5:21-CV-076-M-BQ, 2021 WL 4622528 (N.D. Tex. Oct. 7, 2021))). Contrary to Claimant's argument, in *Brinkman*, the court found that the plaintiff lacked standing to bring the constitutional challenge by failing to "allege facts that support a finding that her injury, the denial of disability benefits, can be or is traced to the conduct of the SSA Commissioner." 2021 WL 4462897, at *2. Citing to *Collins* and *Seila Law*, the court explained: "Because Plaintiff offers nothing that traces the decision by the ALJ in her case to any alleged injurious conduct by the SSA Commissioner, she has not demonstrated traceability and her constitutional violation claim fails for lack of standing." *Id.* (citing *Seila Law*, 140 S. Ct. at 2196 and *Collins*, 141 S. Ct. at 1779). Thus, *Brinkman* does not support Claimant's argument.

In *Sylvia*, however, the court found that "[p]laintiff's separation-of-powers claim is both traceable and redressable such that she has standing to pursue it." 2021 WL 4692293, at *4. The court explained that the traceability requirement was met "[b]ecause the ALJ derives authority directly from the Commissioner, and the ALJ's disability determination becomes the Commissioner's final decision." *Id.* at *3. In so finding, the court observed that "'[i]f the removal protections afforded the Commissioner violate the constitutional requirement of separation of powers, the Commissioner has no authority to delegate.'" *Id.* (quoting *Tafoya v.*

18

*Kijakazi*, No. 21-CV-00871-REB, 2021 WL 3269640, at *5 (D. Colo. July 29, 2021)). *Sylvia*'s conclusion, however, directly conflicts with the Supreme Court's conclusion in *Collins* that the unlawfulness of a similar removal provision did not strip the relevant executive officer "of the power to undertake the other responsibilities of his office." 141 S. Ct. at 1788 n.23 (citing *Seila Law*, 140 S. Ct. at 2207–11). Accordingly, this Court does not find *Sylvia* persuasive. *See Rives v. Comm'r of Soc. Sec.*, No. 1:20-CV-02549, 2022 WL 1076216, at *22 (N.D. Ohio Feb. 4, 2022), report and recommendation adopted, No. 1:20CV2549, 2022 WL 681273 (N.D. Ohio Mar. 8, 2022); *Reese v. Comm'r of Soc. Sec. Admin.*, No. 5:20-CV-2385, 2022 WL 1090538, at *17 (N.D. Ohio Jan. 31, 2022), report and recommendation adopted, No. 5:20CV2385, 2022 WL 831122 (N.D. Ohio Mar. 21, 2022).

The mere receipt of an unfavorable decision is not sufficient to establish harm traceable to the alleged unlawful conduct. Most courts that have examined this issue have concluded that a party similarly situated to Claimant lacks standing by failing to allege facts supporting that the denial of disability payments could be traced to the conduct of the Commissioner of the Social Security Administration. *See Sean E. M. v. Kijakazi*, No. 20-CV-07295-SK, 2022 WL 267406, at *3 (N.D. Cal. Jan. 28, 2022) (citing *Miley v. Comm'r of Soc. Sec.*, 2021 WL 6064754, at *9 (N.D. Ohio Dec. 22, 2021) (rejecting argument that plaintiff had standing because her administrative proceedings were conducted pursuant to policies and regulations implemented by the Commissioner, finding that plaintiff lacked standing absent a harm traceable to an unlawful action by the Commissioner); *Melvin S. v. Comm'r of Soc. Sec.*, 2021 WL 6072564, at *10–11 (W.D. Wash. Dec. 22, 2021); *Rivera-Herrera v. Kijakazi*, 2021 WL 5450230, at *8 (E.D. Cal. Nov. 22, 2021); *Catherine J.S.W. v. Comm'r of Soc. Sec.*, 2021 WL 5276522, at *7 (W.D. Wash. Nov. 12, 2021) (rejecting the argument that "all of the ALJ's who conducted hearings would

have been biased because they were tainted by the alleged separation of powers violation"); *Amanda B. v. Comm'r of Soc. Sec.*, 2021 WL 4993944, at *9 (D. Or. Oct. 26, 2021) ("Because Plaintiff offers nothing that traces the decision by the ALJ in her case to any alleged injurious conduct by the SSA Commissioner, she has not demonstrated traceability and her constitutional violation claim fails for lack of standing."); *Brinkman*, 2021 WL 4462897, at *2; *see also Rives*, 2022 WL 1076216, at *20 (collecting cases); *Reese*, 2022 WL 1090538, at *15 (collecting cases); *Turk v. Comm'r of Soc. Sec.*, No. 1:20-CV-02157-JRA, 2021 WL 6755002, at *11 (N.D. Ohio Dec. 23, 2021), report and recommendation adopted, No. 1:20CV2157, 2022 WL 280454 (N.D. Ohio Jan. 31, 2022); *Rhouma v. Comm'r of Soc. Sec.*, —— F. Supp. 3d. ——, 2021 WL 5882671, at *10 (N.D. Ohio Dec. 13, 2021); *Brunton v. Comm'r of Soc. Sec.*, No. 5:20-CV-2233, 2021 WL 8016911, at *22 (N.D. Ohio Dec. 9, 2021), report and recommendation adopted sub nom., *Brunton v. Kijakazi*, No. 5:20-CV-2233, 2022 WL 950446 (N.D. Ohio Mar. 30, 2022).[1]

Claimant has failed to show compensable harm connected to the unconstitutional removal provision. He asserts that "based on the fact that Andrew Saul's tenure as Commissioner of SSA was unconstitutional, and he was Commissioner at the time of the ALJ and Appeals Council decisions, this matter should be remanded for a *de novo* hearing." (ECF No. 10 at 14). However, "the fact that the removal restriction in § 902(a)(3) is unconstitutional does not entitle [Claimant] to a remand for a new hearing and decision in his case." *Klapp v. Comm'r of Soc. Sec.*, No. 5:20-CV-02850-JDG, 2022 WL 310228, at *15 (N.D. Ohio Feb. 2, 2022). As the Supreme Court in

---

[1] Another court in this district has directly evaluated the issue of plaintiff's harm and not as a matter of standing. *See Haber v. Comm'r of Soc. Sec.*, No. 4:21-CV-1038, 2022 WL 1205383 (N.D. Ohio Apr. 6, 2022); *Lynch v. Comm'r of Soc. Sec.*, No. 1:21-CV-00556-JDG, 2022 WL 614777, at *17 (N.D. Ohio Mar. 2, 2022); *Klapp v. Comm'r of Soc. Sec. Admin.*, No. 5:20-CV-02850-JDG, 2022 WL 310228, at *15 (N.D. Ohio Feb. 2, 2022); *Colbert v. Comm'r of Soc. Sec.*, No. 5:20-CV-2234, 2021 WL 7286802, at *12 (N.D. Ohio Nov. 23, 2021), report and recommendation adopted sub nom., No. 5:20-CV-2234, 2022 WL 556738 (N.D. Ohio Feb. 24, 2022). Nonetheless, in each of the cases, the court concluded that plaintiff had not demonstrated compensable harm stemming from the unconstitutional provision.

*Collins* found, "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office" because the removal restriction was unconstitutional. 141 S. Ct. at 1788 ("unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office, including implementing the third amendment," citing *Seila Law*, 140 S. Ct. at 2207–11).

In his reply brief, Claimant argues that he did not receive "constitutionally valid" decisions by the ALJ and the Appeals Council and that this is his compensable harm. (ECF No. 14 at 5–7). To the extent Claimant again asserts a challenge to Mr. Saul's delegation authority, this challenge fails under *Collins*, as discussed above.

Claimant asserts that "[t]he ALJ in this matter decided this case based on regulations promulgated by the Commissioner when she had no authority to issue the same. Furthermore, the ALJ acted in an official manner, so her decision should be considered as if rendered by the Commissioner." (ECF No. 10 at 12). However, Claimant fails to explain which regulations the Commissioner promulgated that the ALJ used to decide his case. Moreover, Claimant's argument that the Commissioner had no authority to carry out the functions of office because the removal restriction was unconstitutional was rejected by the Supreme Court in *Collins*. *See* 141 S. Ct. at 1788.

None of Claimant's assertions describe the type of compensable harm stemming from an unconstitutional removal provision that was described in *Collins*. Claimant does not state that when his application was pending the President was unable to remove Commissioner Saul from office or believed that he was unable to do so. *See Collins*, 141 S. Ct. at 1789. Claimant does not describe how he was harmed at the time of the ALJ's decision in November 2019 or when the Appeals Council denied his request for review in October 2021. Without a harm traceable to an

unlawful action by the Commissioner, Claimant does not have standing to challenge the constitutionality of § 902(a)(3). *See Rives*, 2022 WL 1076216, at \*22–23.

Accordingly, Claimant's constitutional challenge fails because he "has not described compensable harm due to the unconstitutional removal provision in § 902(a)(3) under which Saul served as Social Security Commissioner." *Lynch v. Comm'r of Soc. Sec.*, No. 1:21CV0556-JDG, 2022 WL 614777, at \*17 (N.D. Ohio Mar. 2, 2022); *Miley*, 2021 WL 6064754, at \*1 ("[Plaintiff] lacks standing to contest the constitutionality of the ALJ's decision based on the president's removal authority.").[2]

The Commissioner also argues that Claimant's request for relief under *Seila Law* fails under other legal and equitable doctrines, including harmless error, the De Facto Officer Doctrine, the Rule of Necessity, and broad prudential considerations. (ECF No. 13-1 at 14–18). Because this Court concludes that Claimant does not have standing, and this Court lacks jurisdiction to hear the relevant constitutional arguments, these additional arguments will not be addressed herein.

Having determined that Claimant does not have standing to assert the constitutional error in his first issue, the Court now turns to Claimant's second issue for review: whether the ALJ failed to review new evidence on remand.

### 2. The ALJ properly followed the remand order to consider Acquiescence Ruling 98-4(6) and did not err in adopting a prior ALJ's disability findings

Acquiescence Ruling ("AR") 98-4(6) codifies *Drummond v. Commissioner of Social Security*, 126 F.3d 837, 842 (6th Cir. 1997), which holds that that the Social Security Administration "[can]not reexamine issues previously determined in the absence of new and

---

[2] Despite Claimant's counsel in *Miley* and *Lynch* being the same as in the case at bar, no appeal was taken by Miley or Lynch to the Court of Appeals.

additional evidence or changed circumstances." 1998 WL 283902, at *2 (S.S.A. June 1, 1998). In *Drummond*, the Sixth Circuit held that a "subsequent ALJ is bound by the findings of a previous ALJ." 126 F.3d at 842. In 1998, the Social Security Administration issued AR 98-4(6), codifying the *Drummond* holding:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

1998 WL 283902, at *3; *Drummond*, 126 F.3d at 842. ("When the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances."). "New evidence" also includes testimony or records demonstrating the claimant's improved health since the prior ruling. *Drummond*, 126 F.3d at 842 (citing *Senters v. Sec'y of HHS*, 1992 WL 78102, at *3 (6th Cir. 1992); *Lively v. Sec'y of HHS*, 820 F.2d 1391, 1392 (7th Cir. 1987)). Further, prior ALJ findings do not carry preclusive effect on new claims for different periods of time. *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 933 (6th Cir. 2018).

Here, the ALJ adopted a prior ALJ's findings because she determined that there was not new evidence of changed circumstances. Claimant argues that the ALJ erred by adopting the prior ALJ's findings as there is new evidence and changed circumstances. The Court disagrees.

This case is Claimant's second application for DIB. His first application resulted in an unfavorable decision from a prior ALJ who determined that Claimant had an RFC to perform light work. (ECF No. 7, PageID #: 123). Claimant appeared before a new ALJ at the hearing for

his second application. The new ALJ adopted the prior ALJ's RFC determination, finding no new material evidence or changes in the law that would necessitate a departure from the prior ALJ's disability findings and rejected Claimant's DIB application. (ECF No. 7, PageID No. #: 45–46). Upon receiving the unfavorable opinion, Claimant filed a complaint in District Court, where the parties eventually filed a joint motion for remand. Joint Motion for Remand at 1, *Fletcher v. Comm'r of Soc. Sec.*, No. 5:18-cv-00654-GJL (N.D. Ohio Sept. 26, 2018), ECF No. 18. The District Court granted the joint motion, and the Appeals Council returned the application to the same ALJ with the following remand instructions:

- Determine whether Acquiescence Ruling 98-4(6) still applies in light of the additional evidence submitted since the prior hearing decision was issued on September 27, 2013 (exhibit B1A).
- Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p). In so doing, evaluate the treating source opinions pursuant to the provisions of (20 CFR 404.1527), and explain the weight given to such opinion evidence. *The ALJ should specifically consider whether the claimant required the use of a cane to ambulate before the [date of last insured.]*"

(ECF No. 7, PageID #: 2299–2300) (emphasis added). In her second decision, the ALJ reviewed a 2016 letter from Dr. Theodore Buccilli, DPM and Claimant's alleged new evidence regarding his overall health. (ECF No. 7, PageID #: 2204–05, 2211–15). However, she found the evidence of cane use uncredible and no material change in Claimant's health between the first and second periods at issue. (ECF No. 7, PageID #: 2204–05, 2215). The ALJ therefore found that AR 98-4(6) still applied and again adopted the prior RFC. (ECF No. 7, PageID #: 2205).

Claimant now argues that the ALJ failed to follow the remand order by incorrectly finding no new evidence that necessitated updated disability findings. (ECF No. 10 at 14–15). He

specifically argues that his cane use, allegedly beginning in April 2014, and his worsening overall health constitute changed circumstances and require a departure from AR 98-4(6). (ECF No. 10 at 19–20). Claimant also contends that *Earley* requires this ALJ to give Claimant's application "fresh review" as this claim relates to a different period of time than his first application. (ECF No. 10 at 16).

> ### a.  Substantial evidence supports the ALJ's finding that Claimant's alleged cane use is not new material evidence.

The Court first reviews Claimant's argument that the ALJ erred in failing to recognize cane use as new material evidence. Claimant submitted a 2016 letter from Dr. Theodore Buccilli, DPM to show he required a cane during the period at issue. (ECF No. 7, PageID #: 2204). Dr. Buccilli wrote that he began seeing Claimant in July 2013 and recommended Claimant use a cane in April 2014 after he observed that Claimant was "extremely unsteady" while walking. (ECF No. 7, PageID #: 2184).

The ALJ found that the record "contradicted" the letter and its allegations about cane use. (ECF No. 7, PageID #: 2205). She noted that Dr. Buccilli had no examination records during the period at issue, and throughout 2015, the ALJ found no record of Claimant's alleged cane use or major walking impediments (ECF No. 7, PageID #: 2204–05). According to two medical appointments in 2015 and 2016, Claimant told Dr. Buccilli he was walking for exercise. (ECF No. 7, PageID #: 2204). The ALJ found that these records contradicted Dr. Buccilli's letter as neither appointment included gait-related diagnoses nor mobility treatment plans. (ECF No. 7, PageID #: 2204). Likewise, the ALJ cited an August 2016 report where Dr. Buccilli opined that Claimant had no limitations standing or walking and did not require an assistive device. (ECF No. 7, PageID #: 2204). She also found that other professionals' records contradicted Dr. Buccilli's letter as they did not recommend Claimant use a cane and observed that Claimant had

regular walking ability. (ECF No. 7, PageID #: 2205). The ALJ considered that Dr. Terry Wagner, D.O., recommended Claimant use a cane in September 2015. (ECF No. 7, PageID #: 1186). However, she disregarded this suggestion since the examination occurred over a year after the date last insured. (ECF No. 7, PageID #: 2215).

Accordingly, the Court concludes that substantial evidence supports the ALJ's finding that Dr. Buccilli's letter was not credible and therefore did not constitute new material evidence for the purpose of disregarding AR 98-4(6).

### b. Substantial evidence supports the ALJ's finding that Claimant's health did not worsen so much as to constitute changed circumstances.

The Court now turns to Claimant's second contention, that the ALJ failed to consider evidence of his deteriorated health as "new evidence" under AR 98-4(6). In support of his argument, Claimant cites the various health conditions he experienced during the period at issue, including cane use. (ECF No. 10 at 16–19). The Commissioner argues that Claimant merely rehashes evidence, rather than stating why these conditions led Claimant to have changed circumstances in his second DIB application. (ECF No. 13-1 at 23–24).

The Court is persuaded that the ALJ considered whether Claimant's conditions had worsened during the second period at issue and substantial evidence supports her conclusion that Claimant's condition remained stable. In his brief, Claimant lists three pages of medical records and examinations he experienced during the period at issue (ECF No. 10 at 16–19) and summarizes the main conditions he alleges worsened during the period at issue:

> [Claimant] had an increase in urine glucose and protein with his blood sugars worsening when he developed back pain (Tr. 287, 296, 888). Fletcher's cardiac condition had changed in that he was no longer asymptomatic and had now had cardiac related symptoms of intermittent leg swelling, palpitations even at rest, and an incredibly abnormal lipid profile (Tr. 95 compared with 726, 730). Dr. Satyan reported that his back pain was worsening

26

with complaints of radiculopathy confirmed by L4/5 and L5/S1 lateral foraminal stenosis (Tr. 880, 883, 686, 690). Pain Management limited the use of his right arm due to pain related to his rotator cuff syndrome (Tr. 556-557, 561). There was a new diagnosis of obstructive sleep apnea (Tr. 656). Dr. Buccilli recommended the use of a cane for support due to his antalgic gait and unsteadiness (Tr. 2154). Psychologically, Fletcher complained of anxiety and nightmares (Tr. 472, 491, 489), that his mood was worse (Tr. 471), and that he had difficulty remembering (Tr. 502).

(ECF No. 10 at 20). Claimant argues that this evidence, as well as his testimony established that "[his] condition had worsened since the prior ALJ decision dated September 27, 2013." (ECF No. 10 at 20). Contrary to his assertion that the ALJ failed to consider this evidence, Claimant appears to admit that the ALJ considered the evidence. Specifically, Claimant states "[t]he ALJ heard the testimony and reviewed the medical evidence, as set forth above documenting the worsening of his condition, and incredulously found that there was no change in [his] condition since the prior ALJ decision." (ECF No. 10 at 20). As Claimant admits, ALJ reviewed this evidence, including the main areas in which Claimant alleges his symptoms worsened: cardiac health, back pain and related symptoms, pain from his rotator cuff syndrome, a new diagnosis of sleep apnea, cane use, anxiety and nightmares, worsened mood, and memory difficulties. (ECF No. 7, PageID #: 2210–17). Thus, the Claimant merely appears to take issue with the ALJ's conclusion that Claimant's condition had not changed enough to disregard the prior ALJ's findings. The Court finds that substantial evidence supports the ALJ's determination.

Beginning with cardiac health, the ALJ reviewed Claimant's examination notes from his cardiologist in March 2014 and noted that the provider observed Claimant had "known CAD"— coronary artery disease ("CAD")—with a low-normal left ventricular ejection fraction on his last assessment. (ECF No. 7, PageID #: 2211 (citing PageID #: 759)). The ALJ found that this was the only appointment Claimant appeared to have with a cardiologist during the period at issue,

and the provider simply noted the condition—he did not diagnose it. (ECF No. 7, PageID #: 2211). Despite Claimant's CAD, the record shows he had normal heart health during the period at issue. The ALJ noted three reports across the period at issue that reported regular heart rate and rhythm with no murmurs, rubs, or gallops. (ECF No. 7, PageID #: 2212). These reports are from October 2013, March 2014, and June 2014, and the ALJ found that they demonstrated Claimant's "entirely normal" cardiac health. (ECF No. 7, PageID #: 2211–12 (citing PageID #: 484, 801, 808)). Review of the record also shows "regular rate and rhythm, no murmurs, rubs, [or] gallops" at appointments in February and April 2014 appointments. (ECF No. 9, PageID #: 803, 805). Taken together, these reports demonstrate substantial evidence to support the ALJ's finding regarding Claimant's stable cardiac health across the period at issue, despite the CAD diagnosis.

Turning to Claimant's allegation of increased back pain, the ALJ reviewed an August 2013 record that "indicated mild facet arthrosis at the L5/A1 vertebral joint, with a bulge and annular tear at the L1-L2 vertebral joint, causing mild canal stenosis, but no comprehensive pathology at any lumbar level." (ECF No. 7, PageID #: 2212 (citing PageID #: 2189)). She noted that an October 2013 x-ray examination of Claimant's lumbar spine was "entirely unremarkable, including throughout flexion and extension views." (ECF No. 7, PageID #: 2212 (citing PageID #: 715)). The ALJ found that diagnostic scanning from the same appointment demonstrated mild degenerative disc disease, but the there was "no frank herniation or compressive pathology at any level." (ECF No. 7, PageID #: 2212 (citing PageID #: 716)). The ALJ observed that while Claimant consulted an orthopedic surgeon twice and was referred on an "as needed" basis to a physical therapist, there were no records he attended these sessions. (ECF No. 7, PageID #: 2212-13 (citing PageID #: 906, 909, 914)). Although Claimant states that "pain management

limited the use of his right arm due to pain related to his rotator cuff syndrome," the ALJ noted that the "alleged tendonitis of the right shoulder . . . would not be preclusive of all types of work" because the record showed mild symptoms and pain that was insignificant enough for Claimant to reject physical therapy. (ECF No. 7, PageID #: 2213). The ALJ also recorded that Claimant indicated the medications prescribed for his shoulder were "effective" in managing his pain and ameliorating his symptoms and that he declined physical therapy and injection therapies for his shoulder. (ECF No. 7, PageID #: 2213 (citing PageID #: 575, 579, 586)). The ALJ also found that most examinations reported mild symptoms:

> General clinical examinations [of the shoulder] included in the record consistently reported either minimal, or wholly benign findings, including one dated October 29, 2013, which indicated full range of motion of all extremities, with normal strength and reflexes, and no neurological deficits (B19F/21), or one dated February 21, 2014, which reported full range of motion of all extremities, with normal strength and reflexes, and no neurological deficits (B19F/18).

(ECF No. 7, PageID #: 2213). The Court finds that these reports amount to substantial evidence that supports the ALJ's finding that new evidence of Claimant's back pain did not demonstrate that Claimant's condition had changed enough to disregard the prior ALJ's findings.

The ALJ then reviewed Claimant's psychological complaints. The ALJ concluded that Claimant's psychological history was generally stable and that Claimant reported his anxiety was "about the same" as in previous appointments in a June 2014 record. (ECF No. 7, PageID #: 2215 (citing PageID #: 498)). Additionally, she noted that providers regularly reported that Claimant was non-compliant with cognitive behavioral therapy and offered "questionable effort." (ECF No. 7, PageID #: 2214 (citing PageID #: 526, 528, 530, 531, 532)). The ALJ also reviewed records with "no indication of deficits of memory." (ECF No. 7, PageID #: 2217 (citing PageID #: 363, 498)). Again, substantial evidence supports the ALJ's conclusion that Claimant's

health condition had not changed enough in this area to warrant disregarding the prior ALJ's findings.

Next, as discussed above, the ALJ considered Dr. Buccilli's letter and opinion alleging cane use beginning in April 2014. But the ALJ found the letter uncredible as it was written two years after the period at issue, inconsistent with Dr. Buccilli's later 2014 and 2015 reports, and contrary to records from other providers during the period at issue. (ECF No. 7, PageID #: 2204–05 (citing PageID #: (letter written two years later); 430–31, 1183–84, 1279 (Dr. Buccilli's 2014 and 2015 treatment records); 575, 579 (Claimant ambulating without difficulty during period at issue))). Thus, substantial evidence supports the ALJ's decision that this alleged cane use was not sufficient to warrant disregarding the prior ALJ's findings.

Lastly, Claimant also claims that an obstructive sleep apnea diagnosis and increased levels of urine glucose, protein, and blood sugars are evidence of worsened conditions. (ECF No. 10 at 20). He further argues that he had kidney disease as of March 2014. (ECF No. 10 at 16). The ALJ did not address the sleep apnea diagnosis in her decision, however, the record demonstrates she reviewed Exhibit B17F, the exhibit the diagnosis was included in, as evidenced by five references to it throughout her decision. (ECF No. 7, PageID #: 2208, 2212, 2216). Additionally, the ALJ examined the exhibits Claimant cites in support of his argument about his increased levels of glucose, protein, and blood sugars—B1F and B19F—and found Claimant's health unchanged. (ECF No. 7, PageID #: 2211–13). The Court finds that Claimant's argument is without merit. Although Claimant mentions these conditions, he points to no specific limitations that the RFC does not include. Instead, he cites portions of the record to support his argument that his health worsened over time. It is Claimant's burden to prove his conditions created limitations, and it is not enough to simply to point out certain diagnoses or health conditions

without proving that they caused restrictions. *See Segers v. Comm'r of Soc. Sec.*, No. 5:16-CV-2017, 2017 WL 9478425, at *10 (N.D. Ohio June 19, 2017) (holding that "citing portions of the opinions that stand for the proposition that plaintiff's vision was 'significantly limited' adds nothing" and is a "flawed" argument), *report and recommendation adopted sub nom.*, *Segers v. Berryhill*, No. 5:16-CV-2017, 2017 WL 4129117 (N.D. Ohio Sept. 19, 2017); *see also Huizar v. Astrue*, No. 3:07CV411-J, 2008 WL 4499995, at *3 (W.D. Ky. Sept. 29, 2008) ("The Court reiterates that diagnosis does not equate with limitation; the existence of a diagnosis cannot establish disability. Rather, the claimant bears the burden of pointing to functional limitations arising from that diagnosis, limitations that prevent the performance of work activity."). Therefore, as Claimant has failed to point to any resulting limitation from a medical opinion that was not included in the RFC, his argument is without merit.

After extensive consideration of Claimant's alleged worsening conditions, the ALJ ultimately concluded that Claimant's condition had not changed enough to disregard the prior ALJ's findings:

> The period relevant to this claim is comparatively quite short, and the burden has fallen on the claimant to produce evidence of substantial worsening over the nine months that elapsed between the date of the previous decision and his date last insured. However, the record shows general stability, typically conceded by the claimant himself, as to his general medical condition (B2F/7, 12, 17), his depression and anxiety remaining "about the same" (B13F/4), see also (B13F/5, 6, 8), and his pain remaining "about the same" (B16F/21, 25). Overall, the record shows stasis for the period relevant to this claim.

(ECF No. 7, PageID #: 2215). Claimant's argument merely highlights that there may be substantial evidence to support an alternative conclusion. This is not enough to disturb the ALJ's finding. As long as substantial evidence supports the Commissioner's decision, the Court must defer to it, "'even if there is substantial evidence in the record that would have supported an

opposite conclusion[.]'" *Wright v. Massanari,* 321 F.3d 611, 614 (6th Cir. 2003) (quoting *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)). Thus, the Court finds that substantial evidence supports the ALJ's conclusion that "there ha[d] been no evidence, new and material to the determination of disability, submitted with this claim, and therefore "it [was] appropriate, to be bound, [ ] by the findings of the prior ALJ." (ECF No. 7, PageID #: 2205).

### c.  Claimant's use of *Earley* is unpersuasive

Claimant finally argues that *Earley* requires *de novo* review of his conditions because this case relates to a period that was not covered in his first DIB application. (ECF No. 10 at 16). However, *Earley* did not *require* subsequent ALJs to make new disability findings for different time periods. It instead held that previous decisions were not binding on subsequent claims for different periods of time and that ALJs may still consider past ALJ decisions. *Earley*, 893 F.3d at 934 ("A later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making.").[3] Thus, the ALJ was not required to make new findings and did not err in adopting the prior ALJ's disability findings for Claimant's conditions between October 2013 and June 2014.

Accordingly, this Court finds that the ALJ properly applied AR 98-4(6) as substantial evidence supports the ALJ's determination that there was no new material evidence to the determination of disability to disturb the prior ALJ's findings. Thus, the ALJ did not err in adopting the prior ALJ's findings.

### 2.  Substantial evidence supports the ALJ's decision not to include Claimant's

---

[3] In fact, the *Earley* court expressly rejected the Social Security Administration's attempt to disregard all prior ALJ findings just because the second claim addressed a new period of time. *See* 893 F.3d at 934 ("The Administration asks us to go further. In reviewing a second application by the same individual, it thinks the administrative law judge should completely ignore earlier findings and applications. But it overstates the difference between our standard and the standard in other circuits. Fresh review is not blind review. A later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making.").

**alleged cane use in the RFC**

Claimant argues that the ALJ failed to support her RFC finding with substantial evidence. (ECF No. 10 at 21). He specifically contends that the ALJ erred in failing to include Claimant's alleged cane use in the RFC and that she did not provide adequate support for this exclusion. (ECF No. 10 at 22, 24). Claimant further argues that the ALJ improperly discredited Dr. Buccilli's opinion as he was the treating podiatrist whose opinion should have held controlling weight. (ECF No 14 at 2–3).

Social Security Ruling ("SSR') 96–9p addresses the use of an assistive device in determining RFC and the vocational implications of such devices:

> **Medically required hand-held assistive device**: To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

> Since most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand.[] For example, an individual who must use a hand-held assistive device to aid in walking or standing because of an impairment that affects one lower extremity (e.g., an unstable knee), or to reduce pain when walking, who is limited to sedentary work because of the impairment affecting the lower extremity, and who has no other functional limitations or restrictions may still have the ability to make an adjustment to sedentary work that exists in significant numbers. On the other hand, the occupational base for an individual who must use such a device for balance

because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded.

In these situations, too, it may be especially useful to consult a vocational resource in order to make a judgment regarding the individual's ability to make an adjustment to other work.

*Titles II & XVI: Determining Capability to Do Other Work-Implications of A Residual Functional Capacity for Less Than A Full Range of Sedentary Work*, SSR 96-9P (S.S.A. July 2, 1996), 1996 WL 374185 (footnote omitted). SSR 96-9p requires medical documentation of the need for the assistive device, not just notations relating to a claimant's continued use of an assistive device. *See Parrish v. Berryhill*, No. 1:16CV1880, 2017 WL 2728394, *12 (N.D. Ohio June 8, 2017) ("While there are some indications in the medical records that Plaintiff was using a cane, this is insufficient to establish that the cane was medically required. Nor does Plaintiff cite to any medical records describing the circumstances for which a cane is needed as required by SSR 96–9p.") (collecting cases). Even a prescription for an assistive device is not sufficient to establish its medical necessity. *See Spies v. Saul*, No. 19-cv-2928, 2020 WL 5044027, at *16–17 (N.D. Ohio Aug. 26, 2020) (although the claimant had prescriptions for assistive devices, there was no error in the RFC because the claimant "does not identify any evidence that meets the standard articulated in SSR 96-9p," which requires documentation of the circumstances where an assistive device is needed) (collecting cases).

Claimant's "medical documentation" establishing and describing the circumstances of his cane use was a 2016 letter from Dr. Theodore Buccilli, D.P.M. (ECF No. 7, PageID #: 2204). As discussed above, the ALJ found the letter uncredible, and substantial evidence supports her exclusion of the cane in the RFC. Furthermore, the 2016 letter does not meet the SSR 96-9p threshold since it alleges that Dr. Buccilli merely suggested—rather than prescribed—cane use.

*See also Perry v. Berryhill*, No. 1:16CV2970, 2018 WL 1393275, at *4 (N.D. Ohio Mar. 20, 2018) ("[S]uspicion that Plaintiff may need a quad cane or walker does not constitute the medical documentation required by SSR 96–9p."). Thus, substantial evidence supports the ALJ's exclusion of cane use in the RFC.

In his reply brief, Claimant argues that the ALJ erred in refusing to give Dr. Buccilli's opinion controlling weight since he was a treating professional. (ECF No. 14 at 3). Claimant specifically claims that the ALJ ignored a 2015 report from Dr. Wagner, who recommended Claimant use a cane. (ECF No. 14 at 3). Although Claimant arguably waived this claim since he did not fully develop the argument in his initial brief on the merits, the Court will nevertheless address the issue.[4]

Under the treating source rule,[5] an ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Blakley* v. *Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2) (eff. to July 31, 2006))). "It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with

---

[4] The Sixth Circuit has repeatedly held that the failure to raise an argument in the initial brief waives the issue. *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) ("We have consistently held, however, that arguments made to us for the first time in a reply brief are waived.") (citing *Am. Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004)); *see also Braun v. Comm's of Soc. Sec.*, 2021 WL 8016061, at *12 (N.D. Ohio Apr. 7, 2021) ("It is well established that arguments made for the first time in a reply brief are waived.").

[5] The regulations for handling treating source evidence have been revised for claims filed after March 27, 2017. *See* 20 C.F.R. § 416.927. Plaintiff filed his claim before the revision took effect.

other substantial evidence in the case record." SSR 96–2p, 1996 WL 374188, at *2 (July 2, 1996).

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. § 404.1527(c)(2) (eff. Aug. 24, 2012). "In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned." *Cole v. Astrue*, 661 F.3d 931, 938 (2011); § 404.1527(c)(2). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting SSR No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). "This procedural requirement 'ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). The ultimate question is whether the Commissioner's decision is supported by substantial evidence and whether it was made pursuant to proper legal standards. *Cole*, 661 F.3d at 939.

Here, substantial evidence supports the ALJ's decision not to afford controlling weight to Dr. Buccilli's opinion. The ALJ first found that Dr. Buccilli's opinions were "not supported by treatment notes from the relevant period." (ECF No. 7, PageID #: 2216). His 2016 letter,

36

alleging that he recommended Claimant use a cane in April 2014, was the only record of any walking difficulties during the period at issue. Likewise, the ALJ noted that Dr. Buccilli's first identifiable reference to Claimant's gait unsteadiness appeared in a November 2016 record, over two years after the period at issue. (ECF No. 7, PageID #: 2204). The ALJ also noted that Dr. Buccilli's opinion was contradicted by reports from the period at issue and was "not consistent with, or supported by treatment notes following the relevant period." (ECF No. 7, PageID #: 2216). While Dr. Buccilli alleged that Claimant had an unsteady gait in April 2014, the ALJ noted that other providers reported the opposite—that Claimant was ambulating without difficulty during the period at issue and through December 2014. (ECF No. 7, PageID #: 2216). Claimant makes much of the fact that Dr. Wagner reported that Claimant needed an assistive device in September 2015. (ECF No. 14 at 3). However, this report is over a year after the date last insured and does not support Dr. Buccilli's opinion that Claimant needed a cane in April 2014. Thus, the Court finds that the ALJ did not err in not affording Dr. Buccilli's opinion controlling weight.

The ALJ ultimately gave Dr. Buccilli's opinion no weight, and substantial evidence supports this finding as the ALJ weighed the *Blakley* factors and gave good reason for her determination. *See* 581 F.3d at 406. The ALJ found that Dr. Buccilli's allegations in the letter were inconsistent with the record as a whole and at odds with his own treatment notes, which he wrote after the date last insured. (ECF No. 7, PageID #: 2205). She noted that Dr. Buccilli even recommended Claimant walk for exercise. (ECF No. 7, PageID #: 2216). Further, as discussed above, the ALJ found that Dr. Wagner's opinion did not support Dr. Buccilli's assertions because Dr. Wagner recommended cane use over a year after the date last insured. (ECF No. 7,

PageID #: 2215). These are good reasons to afford no weight to Dr. Buccilli's opinion, and the Court finds that substantial evidence supported the ALJ's credibility finding.

Accordingly, the Court finds that substantial evidence supports the ALJ's decisions to exclude cane use from the RFC and not to afford controlling weight to Dr. Buccilli's opinion. The Court therefore will not disturb the ALJ's finding.

## VI. Conclusion

Based on the foregoing, it the Court AFFIRMS the Commissioner of Social Security's final decision denying Claimant Disability Insurance Benefits.

**IT IS SO ORDERED.**

Dated: October 7, 2022

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE
